**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


**DERYL DION MORROW,**

     **Plaintiff,**

**v.**                                                                                  **CIV-09-00395 JCH/RHS**

**SANTA FE BOYS&
GIRLS CLUBS,**

     **Defendant.**


## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on *Defendant's Motion for Summary Judgment on Count I of Plaintiff's Complaint for Race Discrimination Under Title VII and the New Mexico Human Rights Act* (Doc. 86), *Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint for Illegal Retaliation Under Title VII and the New Mexico Human Rights Act* (Doc. 84), and *Defendant's Motion for Summary Judgment on Damages* (Doc. 87).[1]  In a case involving alleged employment discrimination, Plaintiff claims that Defendant denied him promotions, advancement opportunities, and fair salary increases, subjected him to suspensions, and ultimately terminated his employment on the basis of his race.  Further, Plaintiff claims that his demotion, suspensions and firing were also acts of illegal retaliation made in response to Plaintiff's threatening to file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and his subsequent filing of that charge.  The Court, having considered the motions, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that

---

[1]Pursuant to a stipulation between the parties, the Court entered an order granting *Defendant's Motion for Summary Judgment on Count III of Plaintiff's Complaint for Negligent Retention, Supervision, and/or Training Under New Mexico Common Law* (Doc. 85) on November 19, 2010.  (Doc. 108).

Defendant's motions are well taken and should be granted.

## FACTUAL BACKGROUND

Plaintiff Deryl Dion Morrow was an employee of Defendant Santa Fe Boys & Girls Club from December 2003 until his termination in March 2008. Plaintiff was initially hired for the position of Education Coordinator at Defendant's Camino de Jacobo unit, for which he was paid $10.00 an hour.  Plaintiff's primary boss was Defendant's then-Chief Professional Officer (CPO), Al Padilla.  Assistant Director Chris Cavazos served as Padilla's second-in-command with respect to Defendant's daily operations.

### Plaintiff's initial promotion and transfer

At some point after his hiring, Plaintiff was promoted to the position of Unit Director at Defendant's Valle Vista unit.  His pay was raised to $13.46 an hour on March 16, 2004.[2]

### Plaintiff's second transfer

In Spring 2005, Plaintiff's pay was raised to $15.86 an hour.  (Doc. 100, Ex. 2 at 4).  It was also around this time that Plaintiff was voluntarily  reassigned  to Defendant's Alto Street headquarters, where he remained in the position of Unit Director.

### Plaintiff requests creation of new Director of Operations position and is denied

Plaintiff approached management for Defendant at some point in 2006 with the idea that Defendant promote him to the position of Director of Operations, which would have given him supervisory authority over all of Defendant's affiliated clubs.  Defendant did not currently have a

---

[2]While Plaintiff repeatedly contends that his only raise in pay occurred on March 16, 2005, at which time his hourly pay was increased to $15.87, (Doc. 94 Ex. 14 at 2), Defendant's payroll records show that he received raises in both 2004 and 2005, as described above.

Director of Operations, and Defendant's management declined to take Plaintiff up on his idea.

*Plaintiff's third transfer and salary relative to other employees*

Plaintiff was involuntarily transferred back to the Camino de Jacobo unit in August 2006. Although he remained a Unit Director, Plaintiff viewed the transfer as a demotion, because the Camino de Jacobo unit was smaller in size and number of staff than Defendant's Alto Street headquarters. He did, however, assume some new responsibilities geared to working at a newer, smaller unit, which Plaintiff claims amounted to "developing a whole entire new facility from scratch." (Doc. 86 Ex. 1, Morrow Dep. at 58:4-58:5).

Plaintiff did not receive a requested salary increase upon his transfer. Instead, Plaintiff alleges, he was told by management for the Defendant that they would conduct a performance evaluation in three months' time to determine his eligibility for a raise. Plaintiff claims that the anticipated evaluation (which should have occurred on November 16, 2006) never took place.

*Desirable Unit Director position offered to Hispanic candidate*

In March 2007, while continuing to serve as Unit Director at Camino de Jacobo, Plaintiff learned that a Hispanic employee, James Rivera, had been offered Plaintiff's former position of Unit Director at Defendant's Alto Street headquarters and declined it.[3] Following a conversation with Rivera, Plaintiff became interested in pursuing the position and raised the issue with Padilla, who told him that he could submit an application. Plaintiff did not receive an

---

[3]While the Complaint recites that Plaintiff "learned that a [Director of Operations] position was offered to an individual without ever being posted," (Doc. 1, Cplt. ¶ 20), the record shows that Mr. Rivera was in fact offered a <u>Unit Director</u> position. Plaintiff's choice of language comes from his allegation that Rivera claimed that his duties if he accepted the position would amount to "everything that a [D]irector of [O]perations was supposed to be doing." (Doc. 86 Ex. 1, Morrow Dep at 152:16-152:17). Plaintiff admits that Padilla took issue with Plaintiff's characterization of the opening as being for a "Director of Operations."

interview, and Defendant named another Hispanic employee, Kacy Ramos, interim Unit Director at the Alto Street Club.

***Plaintiff's July 2007 suspension***

On March 9, 2007, Plaintiff submitted a written request for five days' annual leave for family vacation in June 2007 by leaving the request form on Padilla's desk.  Neither Padilla nor anyone else empowered to do so acknowledged or signed their permission on the form.  Plaintiff alleges this was occasionally the practice of Defendant's management, so that he did not feel he was prohibited from taking leave.  However, when Plaintiff verbally reminded Padilla of his intent to take a vacation the Friday before he left, he admits that Padilla "laughed and said, 'See you Monday.'"  (Doc. 94 Ex. 1, Morrow Dep. at 68:1-68:2).  Plaintiff went ahead with his vacation plans, and missed five days of work..

On July 2, 2007, Plaintiff was suspended without pay for five days due to an "overall lack of leadership [which has led] to an overall dangerous situation that puts the children and the organization in a liability situation . . . ."  (Doc. 86 Ex. 2).  A memorandum by Cavazos recommending suspension gave several reasons for taking disciplinary action,  most of which related to observations Cavazos made about how the site was operating in Plaintiff's absence.  Cavazos described two calls to Defendant from concerned parents of children who attended the Camino de Jacobo unit during Plaintiff's vacation – one of which involved a child who was injured at the site – which precipitated a check-in by Cavazos.  At the site he found, among other things, that "[s]taff at site were not properly trained or notified about accident/injury procedures . . . and thus put the organization in a liability situation," and that "certain staff at the CDJ Club were also very concerned about being left with no leadership."  (Doc. 86 Ex. 2).

Plaintiff has testified that he was asked to work "all the way up through my suspension"

because Defendant was short-staffed (which he agreed to do), so that "[t]hey officially

suspended me through documents, but I was never suspended from work."  (Doc. 94 Ex. 1,

Morrow Dep. at 83:11-83:14).  Elsewhere, however, the record indicates that Plaintiff began to

serve his suspension but returned three days early; he was ultimately paid for this time.  *See* Doc.

94 Ex. 10 at 5; *see also* Doc. 94 Ex. 4.

### Plaintiff's written grievance to Defendant

On July 9, 2007, Plaintiff submitted a nine-page written grievance to Defendant in which

he sought to address the various complaints raised against him in his suspension notice.  Plaintiff

claimed that he was "not the first employee to go on vacation during the summer nor was he told

his leave was not approved," so that his "suspension amount[ed] to disparate treatment."  (Doc

94 Ex. 10 at 3).  Plaintiff further denied responsibility for hiring an unauthorized employee and

for failure to train his staff, and claimed that his transfer to the smaller Camino de Jacobo unit

from Defendant's Alto Street headquarters was the result of his expression of interest in

Defendant's creating a Director of Operations position for him.

Also during this period, Plaintiff informed Defendant of his intent to file a formal

discrimination charge with the EEOC.

### Plaintiff's February 2008 suspension

On February 28, 2008, CPO Padilla issued Plaintiff a 10-working-day suspension without

pay, citing continued insubordination, including Plaintiff's alleged attempts to "contact and

demand to meet with my Board of Directors on personnel issues, which are the responsibility of

management," and Plaintiff's conduct upon returning to the Camino de Jacobo unit following a

meeting with Padilla and Rivera, specifically Plaintiff's making of "an insubordinate and

misleading statement with the intent to undermine the performance of the mission of key

members of the Camino de Jacobo Boys & Girls Club staff." (Doc. 94 Ex. 5).

*Plaintiff's filing of EEOC charge*

On or about March 11, 2008, Plaintiff filed a charge of discrimination with the EEOC. Two days later, on March 13, 2008, the EEOC mailed a Notice of Charge to the Defendant. (Doc. 84 Ex. 2).

*Plaintiff's termination*

In a letter dated March 13, 2008, CPO Padilla terminated Plaintiff's employment. (Doc. 94 Ex. 7). Padilla's letter cited as reasons for Plaintiff's termination his unauthorized February 27 attempt to persuade an unidentified staff member "to go on to your satellite (Camino de Jacobo) to perform new work objectives," which made the other employee upset and uncomfortable; Plaintiff's failure to report to work on March 13, 2008, which Padilla deemed the date of his return from his latest suspension; Plaintiff's unauthorized removal of confidential company documents; and that fact that Plaintiff "continue[d] to commit insubordination." *Id.*

*Plaintiff's new position*

At some point after his termination, Plaintiff became a full-time employee of Southwest Family Guidance Center (SFGC), where he continues to work as a Comprehensive Community Support Service Provider.[4]

## PROCEDURAL HISTORY

On April 24, 2009, Plaintiff filed the instant lawsuit, setting forth counts for (I) race

---

[4]Plaintiff states that he has worked at SFGC since September 2007, which would mean that his period of employment there overlapped with his tenure working for Defendant by approximately seven months. (Doc 87 Ex. 2 at 2). It is unclear when he became a full-time employee of SFGC.

discrimination under Title VII of the Civil Rights Act of 1964 and the New Mexico Human

Rights Act; (II) illegal retaliation under Title VII and the New Mexico Human Rights Act; and

(III) negligent retention, supervision, and/or training under New Mexico common law.  (Doc. 1).

For his claims, Plaintiff seeks the following damages: (1) compensatory damages based on pain

and suffering, mental anguish, emotional distress, loss of reputation, loss of earnings and other

employment benefits and job opportunities (Doc. 1 Cplt. ¶ 45); (2) punitive damages (*id.* ¶ 46);

and (3) attorneys' fees.

On October 18, 2010, Defendant filed the three instant motions, (Docs. 84, 86, 87),

which were fully briefed as of January 4, 2011 (Doc. 115).


## LEGAL STANDARD

### *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be

rendered "where no genuine issue of material fact exists, and the moving party is entitled to

judgment as a matter of law."  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th

Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of

"show[ing] that there is an absence of evidence to support the nonmoving party's case."

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation

and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party

to show that there is a genuine issue of material fact.  The party opposing the motion must

present sufficient evidence in specific, factual form for a jury to return a verdict in that party's

favor."  *Id.  See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the

nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New Mexico Taxation and Rev. Dept.*, No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M., Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation") (internal quotation and marks omitted). In reviewing a motion for summary judgment, the court must "examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir. 2010). Its function at this stage is "not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 243.

## DISCUSSION

## I. Defendant's Motion for Summary Judgment on Plaintiff's Race Discrimination Claim

In support of his Count I for race discrimination under Title VII and the New Mexico Human Rights Act, Plaintiff alleges that Defendant "engaged in a pattern and practice of unlawful discrimination on the basis of race by denying Plaintiff promotions, advancement opportunities and fair salary increases, and by subjecting him to suspensions and termination, on the basis of his race." (Doc. 1, Cplt. ¶ 40). Defendant contends that Plaintiff fails to make a prima facie case for racial discrimination, and, further, that Defendant had legitimate, non-discriminatory reasons for any adverse employment actions it took towards him.

### A. The Applicable Analyses: *McDonnell Douglas* and the Prima Facie Test

In order to prevail on his claim for race discrimination, Plaintiff must demonstrate "by a preponderance of the evidence that the defendant had a discriminatory motive or intent." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir. 1991). Plaintiff is not required to prove

8

that Defendant's actions "were motivated solely by race, but he must show that his race was 'the factor that made a difference.'" *Walker v. Runyon,* 979 F.Supp. 1363, 1367 (D. Kan. 1997) (quoting *Elmore v. Capstan, Inc*., 58 F.3d 525, 530 (10th Cir. 1995). If a plaintiff cannot present direct evidence of his employer's discriminatory intent – as Plaintiff here concedes he cannot (Doc. 94 at 15) – he may nevertheless successfully carry his burden by presenting circumstantial evidence creating an inference of discriminatory intent, using the three-part burden-shifting analysis adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green.  See Hare v. Denver Merchandise Mart, Inc*., 255 Fed. Appx. 298, 301 (10th Cir. 2007).  Under the *McDonnell Douglas* analysis, if a plaintiff employee (1) establishes a prima facie case of discrimination, then (2) the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for having made adverse employment decisions regarding the plaintiff.  If the defendant meets its burden, all presumptions of discrimination are dropped, and (3) the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proferred reasons for the allegedly discriminatory actions are merely a pretext for discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973); *see also Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  Courts considering discrimination claims under the New Mexico Human Rights Act are likewise guided by federal civil rights caselaw.  *See Ocana v, American Furnitire Co.*, 135 N.M. 539 (2004).

As noted above, in order to satisfy the first prong of the *McDonnell Douglas* analysis, Plaintiff must be able to establish a prima facie case of racial discrimination under Title VII and the Human Rights Act.  To do so, he "must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."

*Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quotation omitted).[5]

It is important to note, however, that the third prong of the prima facie test in race discrimination

cases is sometimes articulated as requiring the Plaintiff to demonstrate that (3) "the challenged

action took place under circumstances giving rise to an inference of discrimination." *Woods-*

*Gaston v. Sequoyah Enterprises, Inc.,* 340 Fed. Appx. 450, 452 (10th Cir.  2009); *see also*

*Whitfield v. Potter*, 2008 U.S. Dist. LEXIS 83831, at *10 n.2 (D. Colo., Oct. 3, 2008) ("[t]he

final element of the prima facie case is particularly mutable").  While the "inference of

discrimination" analysis frequently overlaps the "disparate treatment among similarly situated

employees" analysis – *see Woods-Gaston*, 340 Fed. Appx. at 452 ("a plaintiff may raise an

inference of discrimination by showing that the employer treated similarly situated employees

more favorably") (quotation omitted) – the Court will apply both analyses.

### B.  Plaintiff's Prima Facie Case

1. *Class membership*

Plaintiff meets his burden with respect to the first prima facie factor – membership in a

protected class – as he identifies his race as African-American and alleges that Defendant gave

preferential treatment to non-African-American employees.  *See* Doc. 1, Cplt. ¶ 25.

2. *Adverse employment actions*

The second prima facie factor requires Plaintiff to show an adverse employment action.

"An adverse employment action includes acts that constitute a significant change in employment

---

[5]Defendant relies on *Martin v. Nannie & the Newborns, Inc*., 3 F.3d 1410, 1417 (10th Cir. 1993) for the position that the prima facie analysis requires an <u>additional factor</u> requiring Plaintiff to show that his job performance was satisfactory.  The Court notes that in the far more recent case of *Carney*, the Tenth Circuit employed the <u>three-factor</u> analysis for application in racial discrimination suits under Title VII that the Court likewise follows here.  *See Carney*, 534 F.3d at 1273 (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (internal quotation omitted). An adverse employment action is not, however, necessarily limited to such acts, and the Court may "take a case-by-case approach, examining the unique factors relevant to the situation at hand" in determining whether an adverse employment action exists. *Id.* (quotation omitted). The Court will not "consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Id.*

The Complaint does not enumerate under Count I which of the acts described in Plaintiff's factual allegations constitute adverse employment actions taken by Defendant on the basis of racial discrimination. In his response brief, however, Plaintiff proffers a list of examples of adverse actions he allegedly suffered:(1) his involuntary transfer from Defendant's primary facility at Alto Street to its Camino de Jacobo hub; (2) Defendant's failure to promote him; (3) Defendant's decision to not pay him the same salary as other, similarly situated employees; (4) Plaintiff's five-day unpaid suspension in July 2007; his (5) ten-day unpaid suspension in February 2008; and (6) his termination by Defendant. *Id.* The Court will analyze each of the proposed adverse employment actions specifically set forth by Plaintiff but will not comb the record in an attempt to locate which of "Defendant's several disciplinary actions taken against Plaintiff" to which Plaintiff's response brief generically refers (*id.*) could constitute an adverse employment action.

Involuntary Transfer

Although Plaintiff remained at the same pay level and kept his Unit Director title following his reassignment to the Camino de Jacobo unit, the parties dispute whether his transfer

is properly characterized as a demotion, as Plaintiff maintains, or, "as a challenge and a promotion," as Defendant claims.  (Doc. 86 at 8).  Plaintiff's own preference to remain in the Alto Street facility is not relevant to the determination of whether his transfer was an adverse employment action, nor is the fact that he did not desire the reassignment evidence that it was a demotion.  *See James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 993 (10th Cir. 1994).  The burden Plaintiff must meet, however, is to demonstrate that his duties upon his transfer differed so significantly from his responsibilities at Alto Street as to alter the very terms and conditions of his employment.  Although this Circuit "do[es] not deem a *mere inconvenience or alteration* of job responsibilities to be an adverse employment action, the prong is satisfied by a . . . reassignment with *significantly different* responsibilities."  *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (emphasis added) (internal quotations omitted).

Here, while there is no dispute that Plaintiff's transfer required him to take on new duties specific to directing a less-established unit, it is unclear to what extent they differed from the duties he exercised serving in the same position at Alto Street. Plaintiff's only factual allegations on this point are contained in his vague and somewhat hyperbolic testimony that his new responsibilities included "[b]uilding up of a particular town that was damaged by an incident that happened with one of the club officers.  Developing a whole entire new facility from scratch.  Try[ing] to pull in money from resources and community businesses.  Starting from, basically, ground zero and building up something that had been diminished."  (Doc. 94 Ex. 1, Morrow Dep. at 58:2-58:8).  Plaintiff offers no evidence comparing his day-to-day responsibilities as Unit Director at Alto Street and Camino de Jacobo – indeed, he offers no evidence at all as to what his former duties were at Alto Street or what condition that facility was in when he began working there. In the absence of any evidence that Plaintiff's reassignment mandated a

12

significant difference in his responsibilities, the Court cannot simply assume that his involuntary

transfer constitutes an adverse employment action.   *See Sanchez v. Denver Pub. Sch.,* 164 F.3d

527, 532 (10th Cir. 1998) (involuntary transfer to lateral position did not qualify as adverse

employment action where job responsibilities remained the same); *Wells v. Colo. Dep't of*

*Transp.*, 325 F.3d 1205, 1213-14 (10th Cir. 2003) (plaintiff's reassignment did not constitute

adverse employment action where "her job classification and rate of pay remained the same, and

her position was similar to those she had occupied in prior years").

> Failure to Promote

Plaintiff offers no argument in support of his position that Defendant failed to promote

him, but apparently refers to either or both his failure to convince management for the Defendant

to create a Director of Operations position for him in 2006 and/or his subsequent failure to win a

job interview for the position of Unit Director at Alto Street (a role he once occupied), in March

2007.  As to the former event, Plaintiff's inability to persuade management for the Defendant to

make him a Director of Operations – when the evidence indicates Defendant had not employed

one in several years -- while disappointing to him, cannot be said to be an adverse action.  While

the Tenth Circuit "liberally define[s] the phrase 'adverse employment action,'" expanding the

definition beyond monetary losses to include "acts that carry a significant risk of humiliation,

damage to reputation, and a concomitant harm to future prospects," *Annett v. Univ. of Kan.*, 371

F.3d 1233, 1239 (10th Cir. 2004), the perceived loss of an opportunity that never existed cannot

be considered to have injured Plaintiff's future employment prospects.

Further, contrary to Plaintiff's assertion that he was denied promotion to what he

repeatedly terms "the DOO [Director of Operations] position" offered to James Rivera, (Doc 1,

Cplt. ¶¶ 20, 21, 23, 24),  there is no evidence that Plaintiff's failure to obtain the position at issue

is rightly viewed as a "failure to promote."  Plaintiff admitted at his deposition that the vacancy

was, in fact, for Plaintiff's own former position of Unit Director at Alto Street, prior to his

reassignment to Camino de Jacobo.   (Doc. 86 Ex.1, Morrow Dep. at 152:12-152:13) ("I guess

they were looking for a Unit Director").  Plaintiff's characterization of the position relies on his

hearsay testimony that Rivera disclosed in a conversation that, title notwithstanding, his

responsibilities had he accepted the position would have amounted to those of a Director of

Operations.  *Id.* at 153:12-153:15 (Plaintiff testifying that Rivera "just stated that they wanted

him to do the responsibilities of the director of operation [sic] and still run Alto Street").  The

Court, however, "may consider only admissible evidence in reviewing a motion for summary

judgment.  Hearsay testimony is not acceptable evidence." *Trujillo v. Burlington Northern Santa*

*Fe R.R.*, 2010 U.S. Dist. LEXIS 118765, at *21(D. Colo., Oct. 19, 2010) (citing *Wright-Simmons*

*v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998).

        In the absence of any evidence that Defendant's decision not to re-establish Plaintiff as

the Unit Director at Alto Street was a "failure to promote," the Court must consider whether

Plaintiff can show that his failure to obtain a return transfer back to his former worksite is an

adverse employment action.[6]  To be sure, Plaintiff's claims raise questions about the integrity of

the process followed by Defendant in filling the Alto Street Unit Director position.  Plaintiff's

allegation that the never-posted job opening was offered to Rivera as a permanent position

_____

        [6]It is undisputed that within a week of submitting his letter of interest, Plaintiff learned
from Padilla that the position was no longer available, and that it went instead to Kacy Ramos,
who is Hispanic.  (Doc. 86 at 4).  It is unclear whether Ramos was hired in a permanent or
"interim" capacity.  *Cf.* Doc. 1, Cplt. ¶ 23 (alleging that Ramos "was then placed as the interim
Unit Director at the Alto Street Club for eight (8) or nine (9) months" and that what Plaintiff
terms the Director of Operations position "was then withdrawn by Defendant") with Doc. 94 at
7, Plaintiff's Undisputed Material Fact No. 8 (alleging that Ramos "became the 'permanent' Unit
Director at the Alto Street Club").

contradicts Padilla's testimony that permanent positions are typically posted at Defendant's clubs. (Doc. 94 Ex. 6, Padilla Dep. at 1287-128:11). Moreover, Defendant proffers no reason why – having been satisfied with Plaintiff's previous stint as Alto Street Unit Director enough to trust him to build up the Camino de Jacobo unit and deem his involuntary transfer there "a 'promotion' and a 'challenge'" (Doc. 86 at 2) – its management failed to interview him for the position before filling it with another applicant less than a week from the time Plaintiff tendered his application.

But irrespective of Defendant's hiring practices, Plaintiff fails to show how not winning a return transfer to Alto Street constituted a significant change in his employment. In what appears to be his fullest statement on the subject, Plaintiff commented in his July 2007 grievance letter that Padilla's failure to give him the Alto Street position contradicted his earlier representations that Plaintiff would have an "opportunity to grow within the Santa Fe Boys & Girls Club," and argued that his failure to obtain the reassignment was part of an effort to "frustrate" him and other, unidentified employees "and[/]or force them to resign." (Doc. 94 Ex. 10 at 8). (Doc. 94 Ex. 10 at 8). While the grievance makes clear that Plaintiff viewed the opportunity to return to Alto Street as a chance to exercise greater responsibility, Plaintiff has not set forth any argument –save the inadmissible hearsay that Rivera described the job as a quasi-Director of Operations position – explaining how his inability to return to his former worksite impacted his future employment prospects or chances for advancement within Defendant's promotional system. The Court cannot fashion an individualized "failure to promote" claim from general statements and hearsay evidence.[7]

---

[7]Plaintiff asserts for the first time in his response briefs that Bernadette Archuleta-Padilla, "who is Hispanic and [CPO] Padilla's spouse," (Doc. 94 at 8), was internally promoted from

<u>Plaintiff's Salary Relative to Other Employees</u>

Plaintiff further alleges that "Defendant's refusal to pay [him] what other similarly situated employees were getting paid," pointing to seven Hispanic employees "who were Unit Directors or in comparable positions" that he claims received higher pay than he: Bernadette Archuleta-Padilla, Ron Roybal, James Rivera, Brian Chavez, Amos Dean, Pete Gomez, and Benito Martinez. (Doc. 94 at 18). The Tenth Circuit has repeatedly held that an employee has stated a Title VII discrimination claim where he can demonstrate, "as part of his prima facie burden, that he was paid less, or given a lesser raise, than other similarly situated non-protected class members." *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000); *Somoza v. Univ. of Denver*, 2006 U.S. Dist. LEXIS 62394, at *42 (Aug. 31, 2006). Thus, Plaintiff's claim meets the "adverse employment action" prong of the prima facie analysis and rests on his ability to show that his higher-paid colleagues were similarly situated to him, which the Court will analyze at the next prong.

<u>The 2007 and 2008 Suspensions</u>

Finally, the Court finds that Plaintiff's five-day unpaid suspension in July 2007 (which he partly served) and his ten-day unpaid suspension in February 2008 (which he served in full) constitute adverse actions against him. *See Roberts v. Roadway Exp., Inc.,* 149 F.3d 1098, 1104 (10th Cir. 1998) ("[a]ctions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn"). *Duffrey v. Bd. of Comm'rs*, 2011 U.S. Dist. LEXIS 31860, at *29

---

Unit Director to Area Director in January 2008, without the position being posted. Plaintiff does not state whether he was qualified for the position to which Mrs. Padilla was promoted or whether he would have sought it if the Defendant had posted the position; nor does he explain how this factual allegation otherwise constituted an adverse employment action taken against him, and the Court cannot consider it as evidence of one.

(D. Kan., Mar. 25, 2011) ("a three day suspension, without pay, would be an adverse employment action.").

Termination

Finally, Plaintiff's March 2008 termination constitutes an obvious and significant change in employment status and, thus, an adverse employment action.

3. *Disparate Treatment of Similarly Situated Employees/ Inference of Discrimination*

An employee can meet the third prong of the prima facie test if he can show that preferential treatment was given to similarly situated employees outside his protected class or by showing that the defendant's actions or remarks could be viewed as reflecting discriminatory animus or that the timing of events leading up to the adverse action are suggestive of discrimination. *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). The underlying purpose of the Court's inquiry is to determine whether the employer's actions could be found by a preponderance of the evidence to be the result of discriminatory intent. *See Hysten v. Burlington Northern & Santa Fe RR Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

In support of his allegation that Defendant paid him less than co-workers outside his protected class, Plaintiff argues that his higher-paid colleagues were similarly situated because they were, like him, Unit Directors at Defendant's various facilities, or occupied "comparable positions" to that of Unit Director. An undated document detailing the pay history of Defendant's active Unit Directors across its various locations, submitted by Defendant to the EEOC, shows that at the time Plaintiff sought a raise in conjunction with his involuntary transfer in August 2006, he was paid less than Bernadette Archuleta-Padilla, the Unit Director at Defendant's Santa Cruz unit, who made $17.25 hourly to Plaintiff's $15.87. Ms. Padilla is

Hispanic.[8]  Another Hispanic Unit Director, Ron Ruybal, who was hired subsequent to Plaintiff's

first unsuccessful bid for a raise but before his firing, also outearned Plaintiff, making $18.50 an

hour as of his hiring in December 2007. The record also shows, however, that Plaintiff earned

considerably more than two other Hispanic Unit Directors, Kacy Ramos and Crystal Sandoval,

in 2006, both of whom were hired prior to Plaintiff (in 2003 and 2001, respectively) and made

$11.00 an hour in 2006.  (Doc. 94 Ex. 2).  Even crediting Plaintiff's testimony that he believed a

third Unit Director, Pete Gomez, was also paid a higher salary than Plaintiff in 2006 – though

Gomez' name does not appear in the salary listing Defendant provided to the EEOC and Plaintiff

offers no evidence as to his educational background, experience level, or the difference between

their two salaries  (see Doc. 86 Ex.1, Morrow Dep. at 60:8-60:23) – the evidence shows that

Plaintiff's salary fell squarely in the middle of that earned by his fellow, non-African American

Unit Directors.  In the absence of any showing that Plaintiff's experience or education relative to

his fellow Unit Directors made his salary unreasonable in comparison to theirs, the Court finds

no evidence that Plaintiff's salary raises an inference of racial discrimination.[9]

_____

[8]Plaintiff testified at his deposition that Cavazos told him that Padilla "would never pay
me more than what he pays [his wife] Bernadette as a Unit Director.  I felt there was a bit of
racial discrimination involved in that, as well as disparate treatment."  (Doc. 86 Ex.1, Morrow
Dep. at 179:20-179:24).

[9]Plaintiff claims that (1) James Rivera, (2) Brian Chavez, (3) Amos Dean, and (4) Benito
Martinez were also similarly situated employees paid more than he.  Plaintiff does not explain
what position (1) Rivera occupied during the relevant time period or how it was comparable to
Plaintiff's position.  The record shows that (2) Chavez, who replaced Plaintiff as Unit Director at
Camino de Jacobo after his firing, was not similarly situated to Plaintiff because he was not hired
until after Plaintiff was terminated.  (D.I. 94 Ex.2).  (Moreover, the record shows that Chavez
was hired at a lower rate of pay than that earned by Plaintiff, and that the other two Unit
Directors hired after Plaintiff's firing, Martin Cole and Robert Lury, are paid smaller salaries
than Plaintiff earned).  Id.  Plaintiff testified that (3) Dean "was doing PE MOSAA registrations"
and that (4) Martinez was "one of the SMART Moves Coordinator[s]," but offers no argument as
to how their positions were comparable to his, for purposes of evaluating their salaries -- only

18

With respect to his July 2007 suspension, Plaintiff contends he was suspended for taking a five-day summer vacation, when other, similarly situated non-African American Unit Directors were allowed to take vacation in the summer months.  The Court notes two problems with Plaintiff's "disparate treatment" argument.  First, Plaintiff does not argue that the Defendant gave preferential treatment to employees who actually engaged in conduct comparable to Plaintiff's by taking  unauthorized leave from work.  Rather, Plaintiff appears to suggest that his punishment was discriminatory because his similarly-situated colleagues received preferential treatment of their leave requests.  Plaintiff's argument differs from a typical case involving the allegation that an employer manifested discriminatory intent in disciplining an employee, in which the focus is on colleagues who engaged in comparable conduct but received disparate treatment in the meting out of their punishments. *See Rivera v. City and County of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("Comparison of one disciplinary action with another ordinarily is relevant . . . to show the bias of the person who decided upon the disciplinary action."). Similarly, Plaintiff's argument fails to account for the fact that the employees he identifies as similarly situated may not have been similarly situated to him in all respects – as Plaintiff's suspension notice asserted 15 reasons for taking disciplinary action against him.  (Doc. 86 Ex. 2). Thus, the Court finds that the more appropriate analysis on this prong is to consider whether Plaintiff's suspension occurred "under circumstances giving rise to an inference of discrimination," *Hysten,* 296 F.3d at 1181, rather than apply the more narrow disparate treatment test suggested by Plaintiff.

---

that they "worked at the Boys & Girls Club in a different capacity getting paid more than I was." (D.I. 94 Ex.1, Morrow Dep. at 178:16-179:2).  Thus, the Court does not consider any of these individuals as similarly situated to Plaintiff for purposes of establishing his prima facie case.

Plaintiff's evidence with respect to Defendant's leave-granting policies does not help him meet his burden of production.  Plaintiff shows that two non-African American Unit Directors received excused absences for personal (as opposed to medical or school-related) leave in the summer months: Kacy Ramos, who received permission to take one day of leave for "family business" in August 2007 and one week of vacation in August 2005; and Crystal Sandoval, who was permitted to take four days of vacation in August 2006 and August 2007, and seven days of vacation in August 2008.  (Doc. 112 Exs. 21, 22).[10]  While Plaintiff's allegations *might* be sufficient to raise an inference of discrimination if he were challenging Defendant's decision to not grant him leave and shown that the decision was an adverse employment action, Plaintiff makes plain that the adverse action at issue is the "disciplinary action[] taken against Plaintiff . . . which constituted [a] suspension without pay."  (Doc. 94 at 16).  Plaintiff implies that his decision to take an unexcused vacation was justified in light of Defendant's preferential treatment of Ramos' and Sandoval's leave requests, but offers no argument explaining how Defendant's treatment of those requests renders Plaintiff's suspension an act of racial discrimination.[11]  Here, however, the Court has searched the record in vain for any attempt to

---

[10]The Court does not consider the one day of personal leave taken by Bernadette Archuleta-Padilla in August 2002, over a year before Plaintiff came to work for Defendant, (Doc. 112 Ex. 20), or the two leaves taken by Molly Waggoner, a part-time employee whose vacations were unpaid.  (Doc. 112 Ex. 23).

[11]Even if Plaintiff had <u>contended</u> and <u>demonstrated</u> that Defendant's failure to grant his vacation request was an adverse action constituting a significant change in employment status, which he has not, Defendant has articulated a legitimate, non-discriminatory reason for granting Ramos' and Sandoval's leave requests – that their vacations were timed to fall outside Defendant's summer session, which "depends on when the members get out and return to school each year, but [] generally includes all of June to the beginning of August," while Plaintiff requested leave in June.  (Doc. 114 at 2).  "With the prima facie requirements met, the burden shifts to [the Defendant] to articulate some legitimate, non-discriminatory reason" for the challenged action.  *Turner v. Pub. Serv. Co. Of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

show that Defendant discriminated against Plaintiff on the basis of his race in *ordering his suspension*.  Hence, the Court finds that Plaintiff has failed to state a prima facie claim that his July 2007 suspension was the result of Defendant's discriminatory animus.

Plaintiff offers even less evidence that his February 2008 suspension occurred on account of his race.  Rather, he (correctly) describes the suspension as an adverse action in one section of his brief, (Doc. 94 at 16), but fails to mention it again when arguing how the various adverse actions taken against him give rise to an inference of discrimination.  Neither does the summary judgment record contain any evidence that would appear to help Plaintiff carry his burden on this issue.  In the absence of any showing that similarly situated employees engaged in comparable conduct and were not subjected to comparable disciplinary action or that the circumstances surrounding the suspension otherwise give rise to an inference of racial discrimination, Plaintiff fails to state a prima facie claim for Title VII race discrimination with respect to his February 2008 suspension.

Finally, the Court must consider whether a reasonable trier of fact could find that Plaintiff's termination occurred under circumstances that give rise to an inference of discrimination.  Plaintiff does not advance an argument on this point in either his pleadings or briefs.  Moreover, when specifically asked at his deposition why he believed his termination was

---

Defendant's having provided a non-discriminatory reason, the burden would have shifted back to Plaintiff to show that his request was denied on the basis of his race, which would require him to show that Defendant's reason was pretextual.  *Id.* at 1143.  "A claim of pretext . . . may be based on weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . such that a rational trier of fact could find the reason unworthy of belief."  *Id.*  Here, Plaintiff merely states conclusorily that Defendant's non-discriminatory reason was pretextual because its "definition of what constitutes the 'summer months'" is "self-serving and unilateral . . .and  should be ignored by the Court," (Doc. 112 at 4), which would have been insufficient to withstand summary judgment.

discriminatory in nature, Plaintiff did not mention any racial animus on the part of Defendant's management, instead claiming that his firing "was retaliation in regards to me contacting the Board of Directors," (Doc. 86 Ex.1, Morrow Dep. at 183:19-183:20); that he "came back [from suspension] on time and overshadowed [Padilla], (*id.* at 183:25); that the discrimination was "based upon some of the things I said earlier building up to him just trying to get rid of me," (*id.* at 184:5-184:7); and that "I was being perceived as being the CPO of the south side," so that Padilla "felt threatened." *Id.* at 186:16-186:17, 187:5-187:6.  While the Tenth Circuit has held that a plaintiff may ordinarily "make out a prima facie case of discrimination in a discharge case by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was fired, or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, or by evidence that [he] held [his] position for a significant period of time," *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1121 (10th Cir. 1991), the Court cannot find, under the facts of this case, that the Plaintiff's disputed testimony at his deposition that his work was satisfactory is sufficient to state a prima facie claim of racial discrimination, when <u>none</u> of the theories for his termination offered by Plaintiff at the same deposition warrant an inference that the termination was based on his race, and in fact give rise to the opposite inference.  "There must simply be a logical connection between each element of the prima facie case and the inference of discrimination."  *Plotke,* 405 F.3d at 1100.  Thus, the Court finds that Plaintiff has failed to state a prima facie claim with regard to any of the adverse employment actions set forth in his Complaint.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII claim for race discrimination.

**II.  Defendant's Motion for Summary Judgment on Retaliation**

Plaintiff further claims that Defendant retaliated against him for threatening to file an EEOC race discrimination charge in July 2007; copying the EEOC and the New Mexico Department of Labor on the grievance letter he wrote to Plaintiff, also in July 2007; and eventually filing an EEOC charge in March 2008.  To establish a prima facie case of retaliation under Title VII, Plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) he suffered adverse action from his employer; and (3) there was a causal connection between his protected activity and his employer's adverse action.  *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993). In interpreting the New Mexico Human Rights Act, courts likewise follow the *McDonnell Douglas* methodology, which requires Plaintiff to show that (1) he engaged in a protected activity; (2) he was subject to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.  *Gonzales v. New Mexico Dept. of Health*, 129 N.M. 586, 594 (2000).

Defendant's motion for summary judgment on retaliation contends that Plaintiff cannot demonstrate the first element of his prima facie case with respect to any purportedly protected activity that occurred prior to the date he actually filed his EEOC charge, March 11, 2008; that Plaintiff cannot show an adverse employment action prior to his termination, either; and that Plaintiff cannot show a causal connection between the filing of his EEOC charge and Defendant's termination of his employment.

***Protected Activities: Plaintiff's 2008 EEOC Filing and 2007 Threat to File***

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a).  Here, it is undisputed that Plaintiff's filing of his EEOC charge in March 2008 is a

23

protected activity within the meaning of Title VII. (Doc. 84 at 5). Case law from this Circuit further supports the position that Plaintiff also engaged in a protected activity when he made verbal threats to Defendant's management that he intended to file an EEOC charge in July 2007. *Fisher v. Southwestern Bell Tel. Co.,* 2009 U.S. Dist. LEXIS 31866 at *11, 51 (N.D. Okla., April 6, 2009) (describing notification letter from employee's attorney that employee intended to file EEOC charge as protected activity); *see also Dean v. Computer Sciences Corp*., 384 Fed. Appx. 831, 839-40 (10th Cir. 2010) (finding that employee's emails suggesting she "might file an EEOC complaint," taken with her oral statements to supervisor that she believed complained-of harassment was race-and gender-based, "may also have been sufficient to qualify as protected opposition," but not deciding the issue because employee's claim failed on other prima facie element) (emphasis added).

The Court agrees with Defendant, however, that Plaintiff's July 2007 grievance letter did not constitute protected conduct. The nine-page letter sets forth a host of grievances and defenses related to Plaintiff's day-to-day support in his job, but makes no reference to his race or complaint of racial discrimination – rather, the letter suggests in one paragraph that Plaintiff's July 2007 suspension "amounts to disparate treatment," but does not offer any suggestion that the disparate treatment was on account of his race. (Doc. 95 Ex. 10 at 3). The only other hint that Plaintiff's race was intended to factor into his complaints can be found on the letterhead, which indicates that the New Mexico Department of Labor and the EEOC were provided copies of the document. *Id.* at 2. The Court finds that these two cues, such as they are, failed to sufficiently convey to Defendant Plaintiff's belief that Defendant was engaged in a practice made unlawful by Title VII, which "makes it unlawful for an employer 'to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin.'"

24

*Dean*, 384 Fed. Appx. at 838, quoting 42 U.S.C. § 2000e-2(a)(1).  "[A]n employee's complaints regarding unfair treatment, no matter how unconscionable, cannot be protected opposition to discrimination unless the basis for the alleged unfair treatment is some form of *unlawful* discrimination." *Dean*, 384 Fed. Appx. at 838.

### Adverse Actions: Plaintiff's February 2008 Suspension and Subsequent Termination

Plaintiff fails to identify which adverse employment actions he suffered were committed in retaliation for which protected activities in which he engaged.  He does, however, indicate that the same adverse actions that formed the basis of his discrimination claim also underlie his retaliation claim.  *See* Doc. 1, Cplt. ¶ 50; Doc. No.  95 at 17 (Plaintiff's response brief on the instant motion reproducing discussion of adverse actions from his response to Defendant's summary judgment motion on his discrimination claim).  Of the events determined to be adverse employment actions, *see supra* at 10-17, only two fit the appropriate timeframe: Plaintiff's 10-day suspension in February 2008, which could have been an act of retaliation for his July 2007 threat to file an EEOC charge; and his March 13, 2008 termination, which closely followed his eventual filing of that charge.

### Failure to Show Causal Connection

Plaintiff has not shown how his threat to file an EEOC charge in July 2007 resulted in Defendant's retaliating against him by suspending him from work seven months later.  His sole argument on this point is that Padilla admitted at his deposition that prior to June-July 2007, he considered Plaintiff's job performance "satisfactory" or "average"  (Doc. 95 Ex. 6, Padilla Dep. at 159:23-159:25).  According to Plaintiff, "[i]t is telling that prior to July 2007, Plaintiff was considered a satisfactory employee, but that once he engaged in protected opposition activities, Defendant began to suspend him without pay. . . ." (Doc. 95 at 18).  Plaintiff's characterization

of the timing of events is misleading, as Padilla confirmed at his deposition that his opinion of Plaintiff's job performance altered as the result of the events that culminated in Plaintiff's July 2007 suspension – all of which <u>predated,</u> and factored in, Plaintiff's threat to file an EEOC charge.  In the absence of any evidence tending to establish a causal link between Plaintiff's oral statement that he intended to file an EEOC charge and Plaintiff's 10-day suspension the following year, the Court finds that Plaintiff has failed to state a prima facie retaliation claim with respect to these events.

   Finally, the Court must consider whether Plaintiff has asserted a claim that Defendant decided to terminate his employment in retaliation for his protected act of filing a charge of discrimination with the EEOC.  Seemingly in Plaintiff's favor is the temporal proximity between the events – Plaintiff filed his charge with the EEOC on March 11, 2008 and was terminated only two days later, on March 13 – as an employee may frequently establish a causal connection justifying an inference of retaliatory motive by proffering evidence of "protected conduct closely followed by adverse action."  *Annett,* 371 F.3d at 1240.  In this case, however, Defendant argues that the near-immediate turnaround between Plaintiff's filing and his termination does not support a causal connection between the two events, because its management did not even become aware of the charge until receiving notice from the EEOC in the mail four days after firing Plaintiff, "on or around the 17th or the 18th" of March."  (Doc. 95 Ex. 16, Cavazos Dep. at 70:14-72:17).  *See Dean,* 384 Fed. Appx. at 838-39 ("[I]n order to establish a causal connection between the protected opposition and the adverse employment action, the employee's superior must have knowledge that he or she is engaging in such protected opposition, because an employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition.").

Plaintiff contends that Defendant's testimony that it was unaware of his EEOC filing at the time of his firing is untruthful, pointing to what he claims is a telltale admission in his termination letter.  Plaintiff notes that the letter offered his unauthorized removal of confidential documents from his unit as one reason for his firing, which he claims contradicts Cavazos' testimony that documents were found to be missing from Plaintiff's personnel file only *after* the EEOC "provided us with documents that Mr. Morrow had provided to them [pursuant to his filing of his discrimination charge] of which we had no copy in his personnel file."  (Doc. 95 Ex. 16, Cavazos Dep. at 61:7-61:10).

 Plaintiff fails to create a genuine dispute of fact for two reasons.  First, it appears from the portions of Cavazos' deposition contained in the record that the documents Defendant charged Plaintiff with improperly removing at the time of his termination – which "contained personal information on employees of the Club and other information pertaining to the organization," (Doc 95 Ex. 7) – are <u>not</u> the same documents that the EEOC cited in its correspondence to Defendant, which pertained to *Plaintiff's own* disciplinary history and were missing from his own personnel file.  (Doc 95 Ex. 16, Cavazos Dep at 61:4-64:25).  Plaintiff's only reply, upon Defendant's pointing out this apparent inconsistency, is to state that the disagreement presents a "genuine issue[] of fact that must be submitted to a jury on the causal connection element."  (Doc. 95 at 19).

Second, and more importantly, the record contains Plaintiff's EEOC case log, which states that the Charge was "served" on Defendant on March 13, 2008 – the day of Plaintiff's firing, and "forwarded" to the New Mexico Human Rights Department the same day.  (Doc. 84 Ex. 2).  Though the log does not specifically set forth the method by which Defendant was served with notice of his charge, Cavazos testified that the notice arrived by certified mail on

March 17, 2008 and was placed in Plaintiff's personnel file, (Doc. 95 Ex. 16, Cavazos Dep. at 70:25-73:3), and Plaintiff has failed to submit evidence from which a reasonable jury could conclude that Defendant gained knowledge of his EEOC filing by alternate means on March 13, 2008.  In the absence of any evidence tending to show a causal connection between Plaintiff's EEOC filing and his firing, the Court concludes that Plaintiff cannot set forth a prima facie retaliation claim with respect to any of the protected activities and adverse employment actions set forth in his Complaint.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim. Moreover, because Defendant is entitled to summary judgment on the merits of both counts in the Complaint, the Court need not reach Defendant's Motion for Summary Judgment on Damages.

## CONCLUSION

For the foregoing reasons, it is therefore ordered that Defendant's *Motion for Summary Judgment on Count I of Plaintiff's Complaint for Race Discrimination Under Title VII and the New Mexico Human Rights Act* (Doc. 86) and *Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint for Illegal Retaliation Under Title VII and the New Mexico Human Rights Act* (Doc. 84) are GRANTED.

_____

**UNITED STATES DISTRICT JUDGE**